No. ——

First Circuit

---

BIHM v. NEW ORLEANS & MEX. R.R. CO.

——

(Jan. 7, 1927. Opinion and Decree.) .
(May 3, 1927. Rehearing Refused.)

---

(*Syllabus by the Editor*)

1. **Louisiana Digest—Railroads—Par. 59, 64, 77—Automobiles—Par. 5, 7.**

Act 12 of 1924 does not intend that it is sufficient for a party about to cross a railroad track to look and listen from the stop sign, if on looking from that place the railroad is curtained from view. The looking and listening must be done where a view can be had along the railroad both ways.

2. **Louisiana Digest—Railroads—Par. 59, 64, 77—Automobiles—Par. 5, 7.**

Where the driver of an automobile looked from the position of the stop sign where the train was curtained from view by the depot, but drove upon the railroad track without looking again, practically, he did not look for the train at all and was guilty of negligence.

3. **Louisiana Digest—Railroads—Par. 58, 62.**

Where the engineer of a train blew the whistle and did all that he could to avoid a collision with an automobile driven upon the track in front of him, he was not negligent.

4. **Louisiana Digest—Railroads—Par. 61.**

The law does not require that trains be run so slowly that they can be stopped in time to save striking vehicles coming suddenly before them on the track.

5. **Louisiana Digest—Railroads—Par. 59, 64, 77.—Automobiles—Par. 5, 7.**

It is the duty of the driver of an automobile not to drive on the railroad track without first looking for trains from a viewpoint; that if one had been coming he could have seen it and kept out of the way until it had passed.

6. **Louisiana Digest—Appeal—Par. 597.**

Where the charge of the judge to the jury is not in the record the appellate court will presume that the jury was properly instructed.

Appeal from the Parish of St. Landry. Hon. B. H. Pavy, Judge.

Action by Mrs. Theoiste Fontenot Bihm against New Orleans, Texas and Mexico Railroad Company.

There was judgment for plaintiff and defendant appealed.

Judgment reversed.

L. Austin Fontenot and R. L. Garland, of Opelousas, attorneys for plaintiff, appellee.

Dudley L. Guilbeau, of Opelousas, and George Janviér and W. H. Talbot, of New Orleans, attorneys for defendant, appellant.

ELLIOTT, J. Suit by widow for damages on account of the death of her husband and minor child killed by defendant's train.

Willie Bihm, plaintiff's husband, and father of Lee Bihm, driving an automobile in which were also his son, Lee Bihm, about seven years old, Mrs. Hermina Bordelon Gosselin, her daughter, Miss Ida Gosselin, and Clifford Bihm, attempting to cross the New Orleans, Texas and Mexico Railroad track, using a public road crossing, within the limits of the village of Lawtell, was struck and wrecked by defendant's eastbound fast passenger train, and four of the occupants, including himself and child, were instantly killed, Clifford Bihm being the only survivor.

The plaintiff sues to recover damages on account of the death of her husband and child. She alleges that her husband and child were killed as the result of the negligence and fault of the railroad company, its agents and employees in the operation of its said train. That her husband on coming to the stop sign, about fifty feet from the south side of the track, brought his automobile to a full stop and looked and listened for trains. That not seeing nor hearing any, and unconscious of danger, he attempted to cross, but before he could do so, defendant's train struck his automobile, killing him and her child. That there is a whistling post for Lawtell, situated about three hundred yards west of the crossing and that defendant's train did not blow for the crossing, and the bell on the engine was not rung until the post had been passed for some three hundred feet,

when it was too late to notify her husband of its approach. The continuous blowing of the whistle and ringing of the bell, from the whistling post until the crossing was reached, was absolutely necessary by reason of the fact that the depot building obstructed the view of the railroad from the stop sign, for fully a half mile west, and that a train coming east on said account, gets within six hundred feet of the crossing before it can be seen. That defendant's train was being run at about sixty miles an hour, an excessive speed for that place.

That the railroad company had constructed the grade at the crossing higher than was permitted by the ordinance of the Police Jury of the Parish of St. Landry. That the rails on the railroad bed stood four inches above the level of the bed, serving to obstruct the safe and convenient use of the crossing. That if the crossing grade had been constructed and maintained as the ordinance of the Police Jury required, and if the rails of the railroad bed had been laid on a level with the embankment, instead of projecting four inches above it, her husband would have cleared the crossing in safety in advance of the train, notwithstanding the gross negligence of defendant's employees in running at an excessive speed and in not blowing the whistle and ringing the bell at the whistling post as should have been done. That defendant's failure to blow the whistle of its locomotive at the whistling post and to continue whistling and to ring the bell and continue ringing it for the crossing at which her husband was about to cross, combined with the speed of the train, the faulty construction of the crossing grade and the impeded crossing caused by said projecting rails, prevented the passage of her husband's automobile, and caused his death and that of her minor child.

. She claims damages to the amount of $40,000.00 and prays for judgment accordingly.

The railroad company for answer denies that its train was running sixty miles an hour and denies that its speed was excessive. It denied that the grade crossing was higher than the ordinance of the police jury permits, and that its rails stand above the embankment as alleged by plaintiff; denied the negligence alleged against it, and alleged that the direct and proximate cause of the accident was the negligence of plaintiff's husband, in not taking proper precautions to look and listen before attempting to cross the track. Defendant alleged that plaintiff's husband did not look and listen at a proper place, and that if it should appear that the negligence of plaintiff's husband was not the direct and proximate cause of his own death and that defendant was negligent, then, plaintiff's husband was guilty of contributory negligence in not looking and listening for the train at a proper place, and his negligence contributed to his own death and that of her minor child. That his said neglect and failure in the matter stated must be imputed to his son. Defendant finally prayed that her demand be refused and rejected.

The case was tried before a jury which returned a verdict in favor of the plaintiff and against the defendant for $20,-000.00. The defendant moved for a new trial on the ground that the verdict was contrary to law and the evidence. The motion was overruled and judgment based on the verdict was rendered against the defendant for the amount of the same. The defendant has appealed.

The collision occurred on June 10, 1925, at about 2.10 P. M., in the village of Lawtell. The village is not incorporated, but the community is populous and thickly settled. The weather was said to have been fine, from which we understand that the day was fair. Defendant's train was a fast interstate passenger on its way to Opelousas, Baton Rouge and New Orleans. The speed was about fifty miles per hour. This we hold was not excessive for a fast interstate train, through an unincorporated village. An ordinance of the police jury of the Parish of St. Landry adopted August 5, 1912, offered in evidence, requires that grades at railroad crossings are not to exceed one foot in seven. Mr. Hollier, civil engineer, measured the grade at this crossing and states that it is an 8 per cent grade, that is, eight feet to the hundred. Mr. Muckleroy, another civil engineer, measured the grade from the south side, which is the side from which plaintiff's husband approached the crossing, and he states that it is a 6.45 per cent grade, that is, 6.45 feet to the hundred. This measurement if true, is less than that provided for by the ordinance of the police jury. None of the many witnesses, questioned on the subject of the grade, regarded it as an obstruction or impediment, which impeded the use of the crossing. Clifford Bihm, who was in the automobile at the time, does not speak of the height of the grade as a cause which contributed to the collision. It is our conclusion that the grade of the approach to the crossing had nothing to do with bringing the accident about and that the difference between the two witnesses mentioned is unimportant, because the evidence indicated that the grade did not delay nor hinder the passage of the automobile which Mr. Bihm was driving.

Plaintiff claims, and Clifford Bihm testifies that the automobile went over the first rail, but when the front wheels reached the second or north rail, the impact killed the engine, stopping the automobile on the track, and that it was

**43 La. App.**

struck by defendant's train during the momentary delay thus caused. Plaintiff urges from this that the unusual· height of the rails above the railroad bed brought about the death of her husband. A number of witnesses testified that the rails stood about four inches above the level of the road bed and that their automobiles were killed by the rise and drop over the rails. But their evidence shows that the occurrences mentioned were single instances, and no account was taken of their use of the crossing without any trouble of that kind. Other witnesses in number about equal speak of the rail elevation as nothing unusual for country crossings and stated that they had no trouble of the kind in getting over the rails. Mr. Hollier measured the height of the rails above the railroad bed and found that it was 2½ inches. Two witnesses testified that according to the tracks of the automobile, it did not quite reach the second rail, but that the wheels may have struck the rail and bounded back. But if the front wheels did reach the second rail and struck against it, the tracks would not have stopped short of the rail as the witnesses say they did, but would have continued close up to the rail, notwithstanding the rebound. It is our opinion from the evidence that the automobile stopped on the track, just the instant before it was struck, but it is not at all clear that it was the impact of the front wheels against the second rail that caused it. It was impossible for plaintiff's husband to help seeing and hearing the train looming and roaring above and right at him, about the time he got on the track and before his automobile had time to reach the second rail. It is therefore not unlikely that he killed his engine unintentionally himself in a desperate, frantic effort to jump it across the track ahead of the train.

According to Clifford Bihm, when plaintiff's husband left the place where he had stopped and looked near the stop sign, he drove without haste on his way across the track, unconscious of the train at hand. Another witness who saw the automobile at the time, says that it looked to him as if the party driving it did not see the train, almost upon him. The evidence shows that the crossing in question is 627 feet east of the depot. Defendant's train was running at the rate of fifty miles an hour, which one of the civil engineers testified was equivalent to 73.4 feet per second. Such being the case, the train traversed the distance from the depot to the auomobile in less than ten seconds. After the automobile reached the second rail it still had its entire length across the railroad, and if it be supposed that it was kept going at the gait at which it was moving when it came upon the track, it could not have gotten across but would have been struck just about where it occurred. The time that elapsed between the stop and blow was so short that it makes no difference in the matter of consequence.

The evidence shows that there is a whistling post near the depot and one further west near Bayou Mallet about 1700 feet west of the depot. There is a crossing called the Fontenot crossing, which one of the civil engineers estimated was about 1,000 feet, but which the other one says is 650 feet west of the depot. After this crossing comes the depot 627 feet west of the crossing at which plaintiff's husband was killed. The plaintiff urges that the train whistle was not blown and that the bell was not rung for these crossings as the law requires and that if it had been done, her husband would have been warned of his danger in time to have saved himself. Nearly all the

witnesses who testified on that subject stated that they heard the train whistle west of the depot at a place not definitely fixed, but which most of them thought was near Bayou Mallett. But four or five claimed that the whistle was not blown nor the bell rung for the Fontenot crossing, the depot, nor the crossing at which the collision took place. About an equal number declined to say that it was not done, but that they did not hear it. On the other hand the conductor, engineer and fireman on the train declared positively that the whistle was blown at Bayou Mallet and was blown again and the bell rung for the Fontenot crossing, for the depot and also for the crossing at which the collision occurred, all before the train reached them. The train crew are corroborated to some extent in the matter by two witnesses, not members of the crew. One of them was on the train and he says he heard the train whistle for the depot; another, a lady living at Lawtell at the time, says she heard a succession of whistles at the time, but neither of them remembered hearing the bell. It was the duty of the engineer and fireman to blow the whistle for each crossing and ring the bell before reaching same; such things become matter of habit with them. People not engaged in the operation of trains but living near crossings over which fast trains daily pass, become so accustomed to the whistling, and the ringing of the bell, that ordinarily, unless purposely listening, they pay no attention to such things and do not consciously hear them. After considering all that has been said on the subject we think it more than likely and very probable that the whistle was blown and the bell rung, as claimed by the fireman and engineer, and we are not satisfied and therefore cannot hold that such was not done.

It seems to us that the outstanding fact in this case is that plaintiff alleges in her petition that the approach of this eastbound train could not be seen or observed by one stopping at the warning sign, until the train was within six hundred feet of the crossing. That the view of said track westward from the warning post beyond that distance is obstructed from view for fully one-half mile by the depot building, section house, trees and telegraph poles. That her husband after having stopped his automobile at the warning sign fifty feet from the railroad track, hearing no whistle nor bell from an approaching train and not seeing any, was warranted in believing that he could safely drive over the crossing. And the evidence is to the effect that starting from the stop sign or near it, where he had looked and listened, he went leisurely and steadily forward, without looking or listening any more until he was struck on the track. It not only appears from plaintiff's petition, but is a matter agreed by all who testified on the subject, that looking from the stop sign or from any place near it, where plaintiff's husband had looked and listened, absolutely cut off from view, a train coming from the west of the depot. Mr. Hollier says that the view was cut off beyond the depot for 1,107 feet; Mr. Bruce says 1,500 feet. Both say that standing at the stop sign, the depot does not prevent a train further west than that from being seen, but that it goes out of sight after getting within a certain distance, but can be seen of course after it comes from behind the depot curtain. That as you leave the stop sign and approach the railroad, the vision west along the railroad extends further and further and that when you get within twenty feet of the track, the depot ceases to be in the way, and then you can see west along the rail-

road track, as far as the eye can reach. One of the witnesses engaged in hauling gravel over this crossing testified that he had noticed the danger and had cautioned his truck drivers to keep close watch for trains coming from the west, and to look from a place where they could see along the track. Another witness had traveled the same road used by plaintiff's husband, and stopped at the same stop sign. He was accompanied by his wife, and had looked west along the railroad before he stopped. He saw a train coming before it got behind the depot curtain and told his wife about it, but she could not see it and did not think that any was coming, so he told her to wait. They waited and although he knew the train was coming, he did not hear it, but in due time it came from behind the depot and he says that if his automobile had been stopped on the track when it came into view from behind the depot, that he would have had no chance for his life.

Act 12 of 1924 does not intend that it is sufficient for a party about to cross a railroad to look and listen from the stop sign provided for by the act, if on looking from that place the railroad is curtained from view. It intends in conformity with established jurisprudence on the subject, that the looking and listening must be done where a view can be had along the railroad both ways. In this case it must be held that plaintiff's husband did not look at all, because the depot prevented him from seeing west along the railroad, from the place where he looked. Why he did not hear the train in time to stop before getting on the track is impossible to say. It is not indicated by any evidence that his hearing was impaired. The parties in the automobile may have been talking or the noise of his motor may have been the cause. A train running fifty miles an hour or 73.4 feet per second is close behind the noise that it makes in running.

It is established beyond question that at the time plaintiff's husband looked, the train was coming but was curtained from his view by the depot and could not be seen from the place. Practically speaking, it was not different from not looking at all. If he had looked when he got within twenty feet of the track, he would have seen the train; he would have been bound to have seen it; but he did not take the precaution. The engineer, fireman and other members of the train crew should have been on the lookout for this crossing, the approach to which was curtained from their view to the same extent that the train was hidden from defendant's husband. The evidence on that subject is to the effect that the engineer did all that he could, but the collision was unavoidable on his part. The law does not require that trains be run so slow that they can be stopped in time to save striking vehicles coming suddenly before them on the track. It was the duty of plaintiff's husband not to drive on the track without first looking for trains from a viewpoint, that if one had been coming he could have seen it and kept out of the way until it had passed.

The charge of the judge to the jury is not in the record. We take it that they were properly instructed, but their verdict and the judgment appealed from, based thereon, is contrary to the law and the evidence. It is therefore annulled, avoided and set aside and the demand of plaintiff is refused and rejected at her cost in both courts.