HANDY v. N. O. PUBLIC SERVICE, INC.

———

(February 11, 1929. Opinion and Decree.)
(February 25, 1929. Rehearing Refused.)
(March 26, 1929. Decree Supreme Court,.
Writ of Certiorari and Review Refused.)

———

Henry W. Robinson, of New Orleans, attorney for plaintiff, appellant.

B. W. Kernan and Ivy G. Kittredge, of New Orleans, attorneys for defendant, appellee.

JANVIER, J. This suit results from an accident in which a street car of defendant knocked down plaintiff, an old gentleman in his eighty-fourth year. The accident occurred on September 16, 1926, a few minutes after 3:00 o'clock in the afternoon, on the river side street car track at the corner of Burdette Street and St. Charles Avenue.

Plaintiff's injuries consisted of general contusions to the body, knees, elbow and

face. There was a rather serious cut in his thigh, and, on account of his age, his injuries were considered quite serious by the physicians, who, for a time, were of the opinion that his ultimate recovery was doubtful. He did recover, however, although his nervousness continued, and his general mental condition was never again what it had been prior to the accident. The trial court rendered judgment for defendant and from this judgment plaintiff has appealed.

Since the trial below plaintiff has died and his widow, having succeeded to his rights in this suit, has, on proper motion, been made party plaintiff.

Plaintiff charges that defendant was negligent in three particulars:

First: That the street car was not equipped with a fender in accordance with Act 119 of 1912, which requires of street and interurban lines "to equip the front end of all motor cars with fenders for the protection of life and limb";

Second: That the street car stopped just before crossing Burdette Street, which led plaintiff to believe that it was safe for him to cross, and that it then started again and ran him down before he had crossed;

Third: That, after the car started, it could have been stopped in time to avoid striking plaintiff, had the motorman been exercising due care, or had he been properly diligent.

Defendant contends that the fender with which the car was equipped was required by a city ordinance of 1920, and that it also complied with the requirements of Act 119 of 1912; that plaintiff had stopped just before reaching the track, and that, as the motorman was sounding his gong

at the time, he, the motorman, was justified in assuming that plaintiff heard or saw the car coming. Defendant contends that at the last moment plaintiff stepped from his position of safety directly into the path of the oncoming car.

Before entering upon a discussion of the question of the violation vel non of the fender statute and the legal consequences of such violation, if, in fact, there was one, let us see what other acts of the parties may have contributed to or had some causal connection with the accident.

It seems quite evident that the motorman had been ringing his gong just prior to the accident. It is true that some of the witnesses do not remember having heard it. This is natural and usual. As was said in Bihm vs. N. O. Texas & Mexico Ry. Co., 6 La. App. 655:

"People not engaged in the operation of trains, but living near crossings over which fast trains daily pass, become so accustomed to the whistling, and the ringing of the bell, that ordinarily, unless purposely listening, they pay no attention to such things and do not consciously hear them."

That a witness does not remember having heard a bell or a whistle is rather negative than positive testimony, and its effect is easily overcome by direct, positive testimony of other witnesses, who, for good reasons, may have had the sounds in question forcibly impressed upon their recollections. Such positive testimony is given by nearly all those witnesses who were passengers in the car, and who state that their attention was first directed to the imminence of an accident by the violent ringing of a gong.

It is, however, of no great importance to determine whether the gong was ringing, because the only purpose of the gong

is to warn the absent-minded or careless person of the approach of a car, and plaintiff himself states positively that he saw the car and knew how near it was.

That the speed of the car was moderate is proven by the fact that it stopped only five or six feet after striking plaintiff. In fact, he was struck on the foot-path on the lower side of the crossing and the car stopped with its rear end blocking most of the street.

If, then, the car was coming slowly and with the gong sounding, and if, from plaintiff's actions, the motorman could see that plaintiff was aware of the proximity cf the car, what more could the motorman have done? Plaintiff had been standing still in a safe place and had been looking at the approaching car. Why should the motorman expect him to cross immediately in front of it?

Plaintiff's contention that the car had stopped so that he might cross ahead of it is not borne out by the testimony. No witness but plaintiff himself states that it stopped. The principal witness produced by him, Mrs. Davenport, testifies that the car did not stop, but that it slowed up.

It seems very clear that what actually happened was that this old gentleman was standing between the two tracks, looking at the approaching car, when Mrs. Davenport, who had been coming along behind, reached him. She and he chatted for a moment standing on the foot-path between the two car tracks. They both testify to this. She being younger and more active, and realizing that she could cross in front of the car, "skipped" across. At this time he was standing still, looking at the approaching car, and induced apparently by her actions to believe that

there was time to cross, attempted to follow her. It was then too late. Mrs. Davenport's testimony leaves us convinced that the actual facts were as we have set them forth above. On page 16 she said:

"Q. While he was standing in this stop (spot), I suppose he must have stood there for some appreciable time?
"A. He stood there long enough for me to pass him and tell him good evening.
"Q. And he stood there from the time it took for you to walk approximately half way across the roadway across St. Charles Avenue to reach him?
"A. Yes, sir; that's how long he stood there.
"Q. When you passed him, where was the street car then?
"A. The street car had just started to come.
"Q. It had started across the roadway of Burdette Street?
"A. Yes, sir; it was not in the middle of the street.
"Q. But it was crossing Burdette Street?
"A. Yes, sir.
"Q. I suppose you hurried up a little bit?
"A. Yes sir; I almost ran across, to make it over."

She had previously stated on page 12 of her testimony, in answer to the question as to whether she called plaintiff's attention to the fact that the street car was coming:

"A. No, sir; I did not expect him to follow me. After him stopping before the street car, I did not think he would cross, so I ran on across."

Plaintiff claims that he gave a signal to the motorman that he intended to take the car. The testimony on this point, however, if it has any bearing on the case, is conflicting, and it appears that what plaintiff did was to put his hand to his

hat. All witnesses who saw him so testify. We do not see that such an action on his part could be calculated to warn the motorman that he intended to cross in front of the car. On the contrary, when a person stands near a moving train or street car and knows that the train or street car is going to pass him, he usually instinctively clutches his hat so that the wind created by the movement of the car may not blow it off his head. So that, if plaintiff's action in this regard has any bearing on the matter, it seems to us that it rather tends to create an additional reason for justifying the motorman in his belief that plaintiff was going to remain stopped and allow the car to pass.

It appears also that plaintiff had lost the use of one eye and it is possible that this fact may to some extent have interfered with his properly judging the speed of the approaching car. Persons having such deformities are bound to exercise unusual precautions in a dangerous situation because those operating automobiles, street cars, or other vehicles are justified in assuming that persons crossing tracks and streets are in the full possession of their faculties:

"The driver had a right to presume the person sound of hearing, and that she would exercise her senses so as to avoid an accident, by stopping in time to let the mule and car pass freely."
Schulte vs. Railroad Co., 44 La. Ann. 509, 10 So. 811.

For the reasons we have given we are unable to hold defendant liable, unless such liability can be held to result from the alleged violation of Act 119 of 1912, and even if we felt that there was such a violation, which we do not, we could not hold defendant liable unless the violation was a contributing cause to the accident or increased the seriousness of the result.

It is argued that as the fender on this car was under the front end of the car, the statute was not complied with. The evidence shows conclusively that the type of fender in use was much safer and better in every way than the old type of basket fender which extended ahead of the car.

It is also argued that defendant cannot be allowed to violate a statute of this kind and escape liability on the plea that it has substituted for the device required some other device which, in its judgment, is better. This is true, and if we felt that the statute had been violated and that that violation had any causal connection with the accident, or with the seriousness of the result, we would find ourselves under the necessity of holding defendant liable because of the violation.

We feel, however, that the fender in use did not increase the seriousness of the injuries and in fact had no causal connection with the accident and, finally that, as a matter of fact, the fender as used complied in all respects with the statute of 1912.

The statute provides:

"Sec. 1.—Be it enacted by a general assembly of the State of Louisiana that it shall be the duty of every street railroad or interurban railroad or other firms or persons operating any line of street or interurban railroad in this State to equip the front end of all motor cars with fenders for the protection of life and limb, six months after the passage of this Act."

It is argued that this statute requires that a fender project from the front of each car. In construing a statute of this kind, it is necessary to keep in mind the purpose intended by the Legislature to be served. Certainly it was not intended to prevent the body of the car from

striking a pedestrian, but to prevent the wheels and running gear from doing so. The fender contended for by plaintiff was constructed on the front and rear and on its sides of a very heavy iron pipe, which, if it projected from the front of the car, would cause injuries as serious as would the body of the car itself. Therefore, we believe that the words "to equip the front end" mean to equip that part of the front end which is in front of the dangerous portion, against which protection is needed.

Plaintiff argues that the fender in question did not work and that but for the mere chance that the car stopped in time, the body of plaintiff would have been ground to pieces under the wheels. We do not think that the evidence shows this, and we feel that the statements in this regard were made as a result of a misunderstanding of the operation of the fender. The true fact seems to be that when plaintiff was picked up he was lying under the trip or trigger part of the fender and that his having struck that was what caused the fender, which was between him and the wheel, to drop, and to protect his body from the wheels.

In conclusion, it seems to us that the Railway Company did everything that was required of it by ordinance, by statute and by common prudence, and that the sole and only cause of the unfortunate accident was the mistake in judgment on the part of plaintiff himself.

It is therefore ordered, adjudged and decreed that the judgment appealed from be affirmed at the cost of appellant.

WESTERFIELD, J., dissents.