49 So.2d 640 (1950)
STELLY
v.
TEXAS & N. O. R. CO.
No. 3320.
Court of Appeal of Louisiana, First Circuit.
December 22, 1950.
*641 Maurice T. Mouton, George J. Champagne, Jr., Lafayette, for appellant.
Louie M. Cyr, New Iberia, for appellee.
LOTTINGER, Judge.
This is a suit for damages ex delicto by Beulah Babineaux Stelly against the Texas and New Orleans Railroad Company in which she seeks damages for the death of her late husband, Treville Stelly, who was killed when a car, which he was driving, was struck by a train belonging to the defendant company. Plaintiff's demand is in the sum of $26,000.00. Defendant filed exceptions of no right or cause of action, which exceptions were overruled by the lower court.
The accident in question occurred on January 4th, 1947, at approximately 4:15 P. M., at Brannon Crossing, which is located some two miles west of New Iberia on the paved Louisiana Highway No. 25 connecting New Iberia and Abbeville. There is a single track at said crossing which serves *642 two lines, one running between New Iberia and a point near Esterwood, and the other running between New Iberia and Avery Island, a distance of about ten miles. The railroad has no turntable at Avery Island, hence on trips to Avery Island, the engine proceeds in a forward motion and, on the return trip to New Iberia, the engine proceeds in reverse motion.
The deceased was a resident of Abbeville. Prior to the accident, he had been doing carpentry work in New Iberia for a period of about a year. A brother-in-law of deceased, William Sandridge, worked on the same carpentry job as deceased, and it was the practice for them to drive together, in deceased's car, to and from work each day. Together they had traversed Brannon Crossing twice daily, six days per week, for a period of a year prior to the accident.
At Brannon Crossing the railroad track runs approximately north and south, while Louisiana Highway No. 25, a paved highway, runs approximately east and west. The few buildings in the vicinity are well scattered and at such distance from the crossing as not to appreciably obstruct the view along the track from the highway. The highway, on either side of the crossing, is straight for some distance. The highway and railroad intersect at approximately grade level. The record shows that approximately 500,000 motor vehicles make this crossing each year, and that trains pass this crossing four to six times daily, depending on the season.
On the date in question, Treville Stelly and William Sandridge were proceeding from New Iberia to Abbeville, and train number 520 of the Texas and New Orleans Railroad Company was proceeding northerly, from Avery Island to New Iberia. The train consisted of a water car, locomotive, coach and seven box cars loaded with 100,000 pounds of salt. It was necessary to have a water car on this run as there was no place along the route where water might be obtained for the boilers. The makeup of the train as it proceeded towards New Iberia was as follows: first the water car, next the locomotive (proceeding in reverse gear), next the seven box cars, and last the coach. The record shows that it was necessary for the water car to be connected to the rear of the locomotive, as it was being used to furnish water to the boilers. The weather, on that particular afternoon, was married by a drizzling rain and freezing temperature.
William Sandridge testified that he and Stelly left New Iberia at about 4:00 p.m. that afternoon and proceeded westerly, or towards Abbeville, along Louisiana Highway No. 25. Stelly was driving and he, Sandridge, was seated to the right of Stelly on the front seat. Upon reaching Boutte's Dairy, some quarter of a mile before Brannon Crossing, they stopped, whereupon Sandridge got out of the car and wiped the front windshield clear of ice which had accumulated thereon. After wiping both sides clear of ice, Sandridge reentered the car, next to the driver, and they resumed the drive towards Abbeville. On approaching the crossing, Sandridge testified that he looked, in both directions, and listened, for the approach of a train, but that he did not see or hear anything. However, upon reaching a point about twenty feet before the crossing, Sandridge dropped a cigarette and, during these last twenty feet, Sandridge was busy looking towards the floor of the car in order to find the cigarette. He further testified that Stelly was a careful driver and always looked before crossing railroad tracks. The window on Stelly's side was half down and Sandridge testified that, on that afternoon, Stelly had been driving at a speed of twenty or twenty-five miles per hour. Sandridge did not see or hear the train; the impact knocked him unconscious; and he did not know anything of the accident until he regained consciousness later that night. Sandridge testified that the railway company had allowed the weeds along its right-of-way to grow to such height as to obstruct the view, of an approaching train, by a motorist proceeding westerly along said highway. The defendant claims that its train, number 520, was proceeding northerly from Avery Island towards New Iberia at a speed of from 12 to 15 miles per hour when, upon reaching a whistle warning sign some quarter mile before Brannon Crossing, the whistle and the bell were *643 sounded so as to warn motorists of the approach of the train. These two mediums continued to sound their warning until after the impact of the collision, as it was the practice of the railroad to continue the sounding of the whistle and bell until the locomotive had crossed the intersection. Defendant maintains that neither it, nor its employees, were guilty of negligence; that the accident was due entirely to the negligence of Stelly; and, in the alternative, invokes the doctrine of contributory negligence.
The lower court, for reasons given in its written opinion, rendered judgment for defendant and dismissed plaintiff's suit. Plaintiff brings this appeal.
Plaintiff alleges ten instances of error committed by the lower court, upon which he bases this appeal. These will be considered and disposed of in the following paragraphs:

I.
Plaintiff's first charge of error is "Because the Lower Court's final decision was predicated upon the premise, expressed by the Court during the trial of the case, that the Railroad Company's Safety Rules and Regulations formulated by the Safety Experts of the railroad company, had no bearing whatsoever in the decision of the case." Plaintiff contends that failure of the employees of said railroad to comply with said safety rules "constitutes negligence for which railroad is liable when such rules have been adopted in interest of safety." He alleges two rules of the railroad company were violated, which rules are as follows:
"103. When cars are pushed by an engine, except when switching or making up trains in a yard, a member of the crew must take a conspicuous position on the front of the leading car."
"9. Day signals must be displayed from sunrise to sunset, but when day signals cannot be plainly seen, night signals must be used in addition."
As to rule 103, it was conclusively proven that no member of the crew was on the front end of the leading car, i. e., the water car. All members of the crew, except the fireman and engineer who were in the locomotive were in the rear car, or coach. Plaintiff claimed that the train was backing, or being pushed by the locomotive, so as to bring the train under rule 103. Defendant, on the other hand, claimed that the train was being pulled by the locomotive. Because of the peculiar makeup of this train, we feel that, although the water car was being pushed by the locomotive, the remaining eight cars were being pulled. Defendant introduced evidence to show that the water car, in an instance such as here, is considered by railroad men as a part of the locomotive. Although every witness who testified to this fact was an employee of the defendant company, we, in the absence of evidence to the contrary, must take the word of these railroad men and conclude that the water car, in this instance, did form a part of the locomotive. However, should we conclude otherwise, it appears that rule 103 would not necessarily apply here as, in that event, the engine would only have been pushing one, car, i. e., the water car, whereas the said rule refers to cars, in the plural sense. The lower court, on commenting upon the arrangement of the train, said:
"This arrangement is not of itself negligent. The engineer and the fireman could see up the track just as well as if the locomotive had been in its natural position. It was not shown that this water tender obscured their view more than the boiler of the locomotive would. It is therefore evident that this arrangement did not impair the operation of the train, nor contribute to Stelly's death."
We feel, similarly, that Rule 9 does not apply to this case. The accident occurred at 4:15 p. m., on January 4, 1947, at which time a drizzling rain was falling and the temperature was near freezing. The record shows that visibility was about 50% of normal, and several witnesses testified that visibility was about one-half mile. We believe that, under the circumstances, a light on the leading car would have been of little effect. If the deceased was unable to see the train approaching at a few feet, so as to avoid the collision by stopping his car, we fail to see that a light burning during daylight *644 would have drawn his attention to the approaching danger. The evidence clearly indicates that visibility was such that day signals would have been seen by Stelly, had he been keeping a proper lookout.

II.
Plaintiff's second charge of error is based on the premise "in that in its written reasons for judgment the Court set forth that there exists a strong presumption that railroad employees must be considered as having performed their duties." We find no merit in such charge. From a careful reading of the lower court's reasons for judgment, we find the only basis for the charge to be in its discussion of the question as to whether or not the train whistle was sounded prior to the collision. Quoting from the opinion of the lower court:
"There is but little contradiction in the testimony. One point, however, over which the witnesses failed to agree is whether, or not, the whistle of the locomotive was blown and its bell rung as the train approached the crossing.
"There were ten witnesses who testified on the point. William Sandridge who was riding with decedent at the time of the accident testified that he heard no whistle nor bell. In that statement he was corroborated by Sandford Simon. Simon was an occupant of the car that was trailing the death car.
"On the other hand, the entire crew, consisting of five men, testified that the whistle was blown and the bell rung in the usual manner, and in conformity with the law of this state and the regulations of the railroad company.
"Rene and Annie Chaisson, husband and wife, and Felix Williams testified that they heard the locomotive whistle blow immediately preceding the collision. They were in the dwelling that is situated adjacent to the crossing.
"Although it by no means necessarily follows that the competency of evidence is gauged by the number of witnesses testifying on a given point, yet we find here eight witnesses testifying that the whistle was blown and the bell was rung as against two that they did not hear it. This is one of the duties imposed upon the engineer and fireman of a train which are generally carried out in the routine manner. For us to conclude that these ordinary and common tasks were not performed by the parties whose duty it is to perform them, would require convincing evidence. The evidence we have comes very far from convincing us that these signals were not given. We cannot disregard the positive testimony of so many witnesses without having good reasons. These reasons are entirely lacking here."
Certainly the overwhelming evidence on this point was to the effect that the whistle had been blown. We fail to find any apparent error which would justify our reversing the lower court on this point.

III.
Plaintiff's next charge of error is based on the assumption "That the Lower Court has ignored the well established principle of law that a backing train is a more dangerous instrumentality than one proceeding in a forward manner." Plaintiff cites several cases in support of this allegation. We agree that a backing train is considerably a more dangerous instrumentality than one proceeding in a forward motion, however, we do not concur with plaintiff in his assumption that the train, in this case, was a backing one. The units composing the train were so arranged that the locomotive was in reverse gear, but all the cars were following, with the exception of the water car. The water car was being pushed, whereas the other cars were being pulled. Should we consider the water car as part of the locomotive, as is indicated by the testimony of the railroad men, then the locomotive, although proceeding in reverse gear, was leading the train. On the other hand, should the water car be considered not a part of the locomotive, we would still have the locomotive at the head of the train, preceded only by the water car. In each of the cases cited by plaintiff in support of his allegation, the locomotive was the rear unit in the train. Such is not the case here. The engineer and fireman testified *645 that the visibility was no more impaired by virtue of the fact that the water car was being pushed by the locomotive, which was proceeding in reverse, than it would have been had the locomotive been proceeding forward. In proceeding forward, the boiler of the locomotive would have been as much a hindrance to their view, as was the water car in the present setup.

IV.
Plaintiff next charges error in "That the Lower Court's interpretation of the evidence with regard to the dangerous characteristic of the crossing involved was not consonant with the evidence and the principles of law applicable thereto." Evans Bonin, who lived near the crossing, was introduced as a witness by plaintiff to support such contention. Plaintiff labels the crossing as an "exceedingly busy one." Mr. Bonin testified that he saw a good many cars pass the crossing daily. Upon being asked whether they would number in the hundreds, he replied: "I would not say exactly." He testified that cars, trucks and school busses passed the crossing. During the fifteen years that he lived near the crossing, the witness testified that he had seen two collisions at the crossing other than the present one. It is not clear from the record whether the collisions referred to were between automobiles, or trains and automobiles. The witness further testified that two regular trains operate over the crossing daily, each passing the crossing twice daily, making a total of four regular crossings. In addition, a cane train passes during the sugar cane harvesting season. The regular trains pass on schedule when going from New Iberia, but are usually a few minutes off schedule on the return run. This is caused by the fact that they are freight trains and are sometimes delayed in loading or unloading operations.
Plaintiff introduced into evidence a certified copy of a Louisiana Highway Department map showing the amount of vehicular traffic at the point of the collision to be 1340 daily. The only warning of the crossing to the unwary motorist was the familiar rectangular "Louisiana Law Stop" sign. Plaintiff contends that because of the "exceedingly hazardous" nature of this crossing, more substantial indications of warning should have been placed at the crossing, and that the failure of the railway to do so constituted negligence.
We fail to perceive said crossing as an "extremely dangerous one", as is contended by plaintiff. Although every railway crossing is, in a sense, dangerous, the evidence indicates that Brannon Crossing was no more than a "typical rural crossing." The record shows that approximately 1400 cars passed the crossing each day, and six trains passed the crossing each day. The record further indicates that there is no appreciable curve in either the railroad track or the highway for a distance of some quarter of a mile from the crossing. No buildings are situated near the tracks so as to afford any appreciable obstruction of view along the railroad track. In Eggleston v. Louisiana & A. Ry. Co., La.App., 192 So. 774, 778, the Court, confronted with a crossing of a much busier and more hazardous nature than Brannon Crossing, said:
"There is no statute or ordinance compelling the flagging of the crossing in question or the maintenance of safety devices there; and, in our opinion, the surrounding conditions and circumstances do not render it extraordinarily dangerous, requiring the taking of those precautions. It is true that thousands of vehicles traverse it daily, this being due to the importance of the highway and the populous centers located in relatively close proximity thereto; but this factor alone is insufficient."
The record shows that deceased frequently passed this crossing. He was well apprised of its presence, and, certainly, under the restricted visibility, as is here claimed by plaintiff, should have used extra caution in approaching same. Quoting from Hutchinson v. Texas & N. O. R. Co., La.App., 33 So.2d 139, 143:
"`The greater the difficulty of seeing and hearing the train as he approaches the crossing, the greater caution the law imposes upon the traveler.' `The traveler, however, is rigidly required to do all that *646 care and prudence would dictate to avoid injury, and the greater the danger the greater the care that must be exercised to avoid it, as where, because of physical infirmities, darkness, snow, fog, the inclemency of the weather, buildings, or other obstructions and hindrances it is more than usually difficult to see or hear, greater precaution must be taken to avoid injury than would otherwise be necessary'." Barnhill v. Texas & P. Railway Co., 109 La. 43, 33 So. 63.
Plaintiff further contends that the railroad negligently allowed the weeds alongside the track to grow to such height as to obstruct the view of any approaching train. Mr. Sandridge testified that, prior to the accident, the weeds alongside the track were "five or six" feet in height. He testified that on January 7, 1947, he, accompanied by others, returned to the scene of the accident and witnessed several railroad employees cutting the said weeds. Mr. Sandridge could not approximate the number of railroad men employed in this task, nor the distance that the weeds were growing from the tracks. None of the alleged persons accompanying Sandridge testified on this point. His testimony is disputed by Mr. Fleming, a defense witness, who testified that he was in charge of the crew of men which Sandridge had seen along the tracks on January 7th, 1947; that they were not cutting weeds but were surveying the crossing; and that the weeds on the eastern side of the tracks, from which side the Stelly car approached, were approximately four feet above the top of the rails, and that, because of the season of year, the weeds were very thin. He further testified that these weeds were at such a distance from the highway as to offer little, if any, obstruction of view to the motorist using the highway. Both of these witnesses, Mr. Sandridge and Mr. Fleming, were interested in the outcome of this case. Mr. Sandridge was the brother-in-law of decedent, and was accompanying him at the time of the collision. Mr. Fleming was a railroad employee. Residents of the vicinity of the crossing testified that they paid no attention to the weeds alongside the track, and did not know how tall they were. We feel that the weeds were of such a height and nature as to be of little consequence. Had they so obstructed the view, as is alleged by plaintiff, then Stelly should have known such and should have exercised more care in traversing the crossing. Quoting from Hutchinson v. Texas & N. O. R. Co. (supra):
"Even if the weeds had obstructed plaintiff's view, as he claims, his duty to stop, look, and listen was the more incumbent upon him." Perrin v. New Orleans Terminal Co., 140 La. 818, 74 So. 160.

V.
Plaintiff next charges error in "That the Lower Court disregarded the decision in the case of Handy v. New Orleans Public Service, 10 La.App. 72, 120 So. 271 [272], in its appraisal of the testimony of the Chaissons and of Williams." The Chaissons were husband and wife who lived a few hundred feet from the crossing. Williams, who was visiting the Chaissons at the time of the collision, lived several miles from the crossing. These three witnesses testified that the train whistle was blown. In the Handy case, the Court quoting from Bihm v. New Orleans & Mexico Ry. Co., 6 La.App. 655, said:
"People not engaged in the operation of trains but living near crossings over which fast trains daily pass, become so accustomed to the whistling, and the ringing of the bell, that ordinarily, unless purposely listening, they pay no attention to such things and do not consciously hear them."
Quoting further from the Handy case: "That a witness does not remember having heard a bell or a whistle is rather negative than positive testimony, and its effect is easily overcome by direct, positive testimony of other witnesses, who, for good reasons, may have had the sounds in question forcibly impressed upon their recollections."
In the Handy case, the witnesses to whose testimony the above statements were directed, testified that they did not remember hearing the bell prior to the accident. In the present case, the Chaissons and Williams, testified that they did hear *647 the whistle. They testified as to hearing the whistle with relation to the "Knock", which we assume was the noise made by the collision. We feel that the "Knock" would so impress the sounding of the whistle in the minds of the said witnesses as to take them out of the theory of the Handy case. We further feel that a person living near a railway track would be more likely to remember the sounding of the whistle, than he would be to remember the absence of sound, as in the Handy case. Furthermore, the record shows that Williams lived several miles from the tracks and he certainly would not come under the said rule. The said rule was later used, by this court, in Hutchinson v. Texas & New Orleans Ry. Co., La.App., 33 So.2d 139. In that case the rule was again used to avoid the negative testimony of the nearby residents as against the positive testimony of the railway employees. The situation here is different, as here the testimony of the Chaissons is positive, and is being used to strengthen the testimony of five railroad employees who testified that the whistle had been sounded.

VI.
Plaintiff's next charge of error is "The palpable failure of the Lower Court to properly evaluate the testimony of the railroad employees with regard to their veracity considering that they testified exactly alike on all important points." The only point in which we find any marked similarity in the testimony of the railroad employees was concerning the speed of the train. The five employees constituting the crew of this train testified that the train was proceeding at a speed of from "12 to 15" miles per hour. Such similarity was odd in view of the fact that three of the said employees were in the rear car which was tightly closed because of the freezing weather. It was strange that they would approximate the speed within the same limits. However, we fail to find any such similarity as to the other important points involved. As a matter of fact the only points as to which all five employees testified was regarding the blowing of the whistle and the approximate speed of the train. Their testimony as to the whistle having been blown was corroborated by the Chaissons and Williams, disinterested witnesses. There is a possibility that the testimony of the three employees who were riding the rear coach was influenced by their discussion of the accident, with the engineer and fireman, following the accident. The engineer and fireman, both riding the locomotive, were certainly in a position to approximate the speed of the train. Testimony shows that the speed limit of a train using those particular tracks was 20 miles per hour. The record shows that, once the brakes were applied, it took the train about 200 feet to come to a complete stop. This would indicate to us that the train was proceeding at a proper and reasonable speed. No evidence was introduced by plaintiff to show that the train was proceeding at an unreasonable rate of speed.

VII.
Plaintiff's next charge of error is that "The Lower Court, in its written reasons, did not discuss or mention a single case cited by plaintiff." We know of no law which requires a court to discuss cases cited by counsel.

VIII.
Plaintiff's next charge of error is that "The written reasons of the Lower Court with regard to the facts and evidence adduced at the trial is not expressive of the actual facts." This charge is merely expressive of the opinion of counsel, which opinion is necessarily biased. The Lower Court was in the favorable position of having the witnesses testify in its presence. The said court then evaluated the testimony of the witnesses and reached its conclusions of fact which, coupled with the law on the subject, dictated the judgment to be rendered. The Appellate Courts of this state have long held that questions of fact found by the lower courts will not be disturbed except when clearly erroneous. We feel that the conclusions reached by the Lower Court were based upon the preponderance of the evidence.

IX.
Plaintiff next charges error in "That the tenor of the written reasons for *648 the Lower Court is to the effect that the railroad is absolved from all liability by reason of the fact that it was found that the whistle of the train had been blown, whereas the jurisprudence of Louisiana positively recites that the duty of the railroad does not end there." Although the law does state that the duty of the railroad does not end with the blowing of the whistle, we feel that the tenor of the lower court's reasons were not as charged by plaintiff. It is true that the lower court did decide that the train whistle had been blown, a conclusion which is supported by the preponderance of the testimony. The lower court considered, separately, each allegation of negligence charged by plaintiff. The reason for judgment by the lower court was based on a thorough analysis of all the facts presented, and, after weighing all the evidence, the lower court found in favor of defendant. Quoting from the reasons for judgment of the lower court:
"It is apparent therefore, that plaintiff has been unsuccessful in proving any of the acts of negligence with which she charged the defendant. There is no doubt that her husband met his death through his own negligence in failing to keep a careful watch for approaching trains before he went over the crossing. Under these conditions plaintiff is barred from recovery."

X.
Lastly, plaintiff charges error in "That the final decision of the Lower Court is based upon the premise that the failure of the deceased to come to a complete stop constituted such negligence upon his part which bars recovery, whereas it is very definitely established by the jurisprudence that a motorist need only have his motion so checked and under control as to permit him to stop instantly if need be." Rule 17, Section 3, of Act No. 286 of 1938, Dart's Statutes, § 5222, places upon the driver of a motor vehicle, when approaching a railroad crossing, the duty to stop, look and listen. Said act states: "In the event it is impossible so to do, then such persons shall proceed only with the greatest caution and at their peril." Section 3 of Act No. 12 of 1924, Dart's Statutes, § 8138, places a similar duty upon the driver of a motor vehicle. In Hutchinson v. Texas & New Orleans R. Co., 33 So.2d 139, 143, this Court, quoting from Illinois Central R. Co. v. Leichner, 5 Cir., 19 F.2d 118, said:
"Controlling Louisiana decisions show that the law of that state exacts from the driver of an automobile who approaches a railroad crossing, where the view along the tracks from a direction from which a train may come is obstructed, the duty to stop, look, and listen before driving upon the crossing, or so near thereto as to be endangered by a passing train; that the greater the difficulty of seeing or hearing a train as he approaches the crossing, the greater the caution the law imposes upon him to use his senses of sight or hearing, one or both, when and where a reasonable and practicable use thereof would enable him to learn of the presence or absence of danger at the crossing; and that, though the operator of the railroad is chargeable with negligence which was a proximate cause of any injury to the traveler at the crossing, a right to recover damages for that injury is barred if the traveler's negligent failure to do all that care and prudence would indicate to avoid injury was a proximate contributing cause of the injury sustained. Perrin v. New Orleans Terminal Co., 140 La. 818, 74 So. 160; Tucker v. Illinois Central R. Co., 141 La. 1096, 76 So. 212; Callery v. Morgan's Louisiana, etc., Co., 139 La. 763, 72 So. 222; Leopold v. Texas & P. R. Co., 144 La. 1000, 81 So. 602."
In Hutchinson v. Texas & N. O. R. Co. (supra) the Court quoting from Perrin v. New Orleans Terminal Co., 140 La. 818, 74 So. 160, said:
"Even if the weeds had obstructed plaintiff's view, as he claims, his duty to stop, look, and listen was the more incumbent upon him. We say in Blackwell v. St. Louis Railroad Co., 47 La.Ann. 268, 270, 16 So. 818, 819, 49 Am.St.Rep. 371:
"`These obstructions, while they are not to be lost sight of in considering the question of responsibility, certainly should have suggested caution to travelers about crossing the tracks'."
*649 The record indicates that deceased saw, or heard, the train just a second or two before the crash. This is shown by a Mr. Simon, who was driving a car following the death car, and the engineer of the train. Mr. Simon testified that Stelly was preceding him at a distance of about 40 or 45 feet and at about the same speed as Simon was driving, 20 to 25 miles per hour; that he did not notice any reduction in speed of the Stelly car as it approached the tracks; and that Stelly drove off the pavement when he came to a point about ten feet from the tracks. From such evidence we conclude that Stelly first noticed the approaching train just a second before entering the crossing, at which time he attempted to avoid being hit by the train by driving around it. The engineer testified that he saw the Stelly car approaching the tracks and that it appeared to him at the last moment Stelly attempted to speed up in order to cross the intersection in front of the train. Plaintiff failed to prove that Stelly did look and listen for the train on approaching the crossing. During the last few seconds before the accident, Sandridge was occupied by attempting to brush cigarette ashes off the seat and did not notice whether Stelly looked. Sandridge further testified that the deceased, upon approaching the crossing, released his foot from the accelerator, however he did not use his brakes to stop or slow down. The act of releasing his foot from the accelerator, although it would relieve the forward traction of the automobile, would be of no effect in bringing the car to a controlled stop. Simon testified that he noticed no reduction in speed of the death car as it entered the crossing. We feel that the evidence shows that the deceased did not have his automobile under such a degree of control as to have brought it to a full and complete stop upon noticing the approaching train. Deceased was well familiar with the crossing, and had he been traveling in a reasonable and proper manner, and had he been keeping a proper lookout under the adverse weather conditions, he would have been in a position to stop and avoid the accident, rather than to attempt to drive around the train.
Plaintiff attempts to justify the failure of deceased to stop to the fact that the Simon car was following deceased at a distance of some forty feet, and that, had deceased stopped, the following car would have crashed into the rear of his car. This is merely an assumption by plaintiff as we have no way of determining what entered Stelly's mind when he became aware of his peril. Simon refutes this assumption, as he testified that he had plenty of room in which to stop, and that he knows of no reason why the deceased failed to stop. The record shows that Simon was traveling at a speed of from 20 to 25 miles per hour; that upon discovering the imminence of the collision he had room to stop, but instead, chose to turn off into a side road which is about twenty-five feet from the tracks and runs parallel thereto. This indicates to us that the Simon car was at a respectable distance behind the death car, and we fail to find that the presence of the Simon car was any justification for Stelly's failure to stop.
Plaintiff cites several cases wherein damages were recovered by automobile drivers who failed to bring their cars to a complete stop before unsuccessfully attempting to negotiate a railway crossing. We concur that many such decisions have been reached, however, in each of the cited cases it was shown that the driver did look and listen for the approaching train. Stelly was well familiar with this crossing, he passed it daily. Under the adverse weather conditions, there was a greater duty upon him to exercise more caution than would be required under normal weather conditions. The record discloses that the visibility was such that Stelly would have seen the train had he looked. We conclude that the failure of the deceased to exercise the precautionary measures incumbent upon one approaching a railway crossing was a contributing, if not the proximate, cause of the collision.
Among the acts of negligence of the railroad claimed by plaintiff is the fact that the water car was painted a "dull red"; that as a result of said coloring, the water car was hard to see, particularly when wet. Because of the dense smoke emitted by the great majority of locomotives, all railway cars are rendered dull regardless of the *650 color they are painted. The public is well aware of this and we fail to find any negligence on defendant, on this score. Certainly the dull red of the water car was more observable than the drab coloring of the locomotive boiler which is generally the leading portion of a train.
Considering the record as a whole, we fail to see that plaintiff has presented a case which would justify recovery in this state. Although the preceding portions of this opinion might leave the reader with the view that we feel the defendant railway company to be entirely free from any negligence whatsoever in this case, such is not the intention of this court. We have merely attempted to express our views upon certain charges of error made by plaintiff. We do not feel that everything possible was done by the railway company to avoid accidents at this crossing and under the weather conditions which prevailed on the date of the accident. However, we do feel that, though the railroad companies do owe a duty to the motoring public to take reasonable precaution and care toward them, we also feel that there is a duty of the motoring public to exercise reasonable and prudent care and caution when entering a railroad crossing. We find that the proximate cause of the collision was the failure of deceased to exercise reasonable care and caution in entering the crossing, which considering the weather conditions, constituted gross negligence. Lastly and solely for the sake of argument, supposing that the railway company was negligent because of any of the reasons alleged by plaintiff, we feel that the above mentioned acts of deceased were such as to come within the doctrine of contributory negligence, and thus bar recovery.
Although the plaintiff did not invoke the doctrine of last clear chance in his petition, he did argue same in his brief and in his appearance before this court. Recovery, under said doctrine, was allowed in O'Conner v. Chicago R. I. & P. Ry. Co., La.App., 40 So.2d 663. In that case the train was approaching a crossing at a rate of 18 miles per hour. The fireman saw a truck approaching the crossing, at a speed of some 12 miles per hour, when it was some 250 to 350 feet from the crossing, but thought that it would stop to allow the train to pass. When the truck reached a distance of about 150 feet from the crossing, the fireman became aware of the fact that the truck would not stop, where upon he hollered for the engineer to bring the train to a stop. At the time, the train was some 150 feet from the crossing, but, because of the noise made by the train and whistle, the engineer did not hear the warning, and, consequently, the brakes were not applied until after the train had struck the truck. The engineer, being on the opposite side of the locomotive from the approaching truck, did not see the truck until after the crash. In holding the railroad liable under the doctrine of last clear chance, the Court said that it was the duty of the fireman to warn the engineer in such a manner and method that he would be certain to hear such warning; that, had the warning been heard and the brakes applied, although the train might not have come to a complete stop before reaching the crossing, that, at least, the forward motion of the train would have been sufficiently arrested as to allow the truck to pass unharmed.
The O'Conner case is strikingly similar in nature to the present one, except for a few pertinent facts. In the present case, as in the O'Conner case, the engineer was on the opposite side of the locomotive from Stelly, and, therefore, the engineer did not see the Stelly car until the impact. The fireman, being on the same side of the locomotive as Stelly, first noticed the Stelly car when it was about a city block from the crossing, at which time the train was some 60 or 65 feet from the crossing. The fireman thought, at the time, that the Stelly car would stop at the crossing, a conclusion which was reasonable. The fireman did not realize that the Stelly car would not stop until it was about 100 feet from the crossing, at which time the train was some 30 feet from the crossing. At that time the fireman hollered to the engineer to stop, but because of the noise made by the whistle, the engineer did not hear the warning. Had the engineer heard the warning of the fireman, we are of the opinion that the brakes could not have been applied soon *651 enough to avoid the crash. It would have taken some instant of time for the engineer to react to the warning and apply the brakes, and another instant of time for the brakes to perceptively retard the forward motion of the train. During these instants of time, the train would have traversed the remaining thirty, feet, and thus we feel that they had no last clear chance to avoid the collision.
For the reasons assigned, the judgment of the lower court is affirmed.
Judgment affirmed.